P.C.M.E. COMERCIAL, S.E. y DECEMOR, S.E., interventores y recurridos, *v.* JUNTA DE CALIDAD AMBIENTAL, JUNTA DE PLANIFICACIÓN, agencias recurridas, MONTERREY, S.E. y MR (VEGA ALTA), INC., peticionarios.

*Número:* CC-2004-357   *Resuelto:* 23 de diciembre de 2005

*José R. Lázaro Paoli, Maretsa Rodríguez Portela* y *Daniel Martínez Oquendo*, abogados de la parte peticionaria; *Vionette Benítez Quiñones*, abogada de la parte interventora.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

El 28 de diciembre de 1992, Monte Rey, S.E. y M.R. Vega Alta, Inc. presentaron ante la Junta de Planificación una consulta de ubicación([1]) para el desarrollo de un extenso proyecto residencial y comercial llamado Comunidad Monte Rey. Éste sería desarrollado y construido en varias fincas del Bo. Espinosa del Municipio de Vega Alta([2]) con una cabida de mil veinticuatro cuerdas.([3]) Como parte del trámite de dicha consulta, la Junta de Planificación, como agencia proponente, ordenó la preparación de una declaración de impacto ambiental preliminar (DIA-P),([4]) la cual fue circulada a las entidades concernidas el 27 de octubre de 1994 —entre éstas la Junta de Calidad Ambiental— para su aprobación.

Luego de varios incidentes procesales, el 3 de febrero de 1995 la Junta de Calidad Ambiental le requirió a la Junta de Planificación una información adicional sobre la DIA-P, ya que en ésta se encontraban ausentes ciertos elementos

---

([1]) El número de consulta es 92-10-1418-JPU.

([2]) El área para el proyecto propuesto forma parte de un valle delimitado por una cadena de mogotes al norte, al oeste y al sur. En dichos mogotes existe múltiples especies de flora y fauna. Además, el Bosque Estatal de Vega bordea los terrenos objeto del proyecto.

([3]) El referido proyecto se compone de 4,776 unidades de vivienda de distintos tipos y costos, un centro comercial con un área de 1,677,000 pies cuadrados, edificios de oficina con un área de 200,000 pies cuadrados, y áreas recreativas y comunitarias.

([4]) La orden de preparar una declaración de impacto ambiental preliminar (DIA-P) fue producto, en parte, de unos comentarios sometidos por el Departamento de Recursos Naturales y Ambientales, el 24 de mayo de 1994, durante el proceso de evaluación de la consulta de ubicación para el proyecto. En dichos comentarios, ese Departamento expresó su preocupación debido a los efectos del proyecto sobre los recursos naturales del área. Entre éstos, señaló la destrucción de una gran cantidad de mogotes que podrían contener su vegetación original, la presencia de sumideros, los cuerpos de agua en o adyacentes al proyecto y la inclusión de terrenos pertenecientes al Bosque Estatal de Vega que serían afectados por el desarrollo. A esos efectos, el Departamento de Recursos Naturales y Ambientales solicitó la preparación de una declaración de impacto ambiental, la cual debería atender dichas preocupaciones y realizar una descripción detallada de la flora y la fauna.

de juicio esenciales para poder realizar una evaluación adecuada del proyecto.([5]) En respuesta, la Junta de Planificación sometió ante la Junta de Calidad Ambiental un Suplemento a la DIA-P el 21 de septiembre de 1995, en el cual se tomaron en consideración los aspectos planteados en dicha solicitud.

Luego de examinar la información sometida por la Junta de Planificación y los comentarios recibidos sobre el proyecto, en especial de dos de sus opositores —P.M.C.E. Comercial, S.E. y Decemor, S.E.— la Junta de Calidad Ambiental solicitó una información adicional el 29 de marzo de 1996 para responder a dichos comentarios. En virtud de ello, el 16 de mayo de 1996 la Junta de Planificación sometió un Segundo Suplemento a la DIA-P con la información solicitada.

Al recibir el referido suplemento, la Junta de Calidad Ambiental publicó un Aviso anunciando la celebración de una vista pública para discutir el proyecto y la disponibilidad de la DIA-P con sus dos suplementos. A esos efectos, el 24 de junio de 1996, la Junta de Calidad Ambiental celebró unas audiencias para dilucidar las inquietudes y los asuntos concernientes al proyecto Comunidad Monte Rey, en donde participaron tanto agencias gubernamentales, estatales y federales, así como entidades y personas a favor y en contra del proyecto.([6]) Por su parte, el 22 de agosto de

---

([5]) Como parte del proceso evaluativo de la Consulta de Ubicación, el 29 de diciembre de 1994 la Junta de Planificación celebró una inspección ocular de los terrenos en que se construirá el proyecto, con la participación de varias agencias gubernamentales y los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. En virtud de dicha inspección, el 3 de marzo de 1995 el Departamento de Recursos Naturales y Ambientales sometió unos comentarios a la Junta de Planificación a través de su Secretario, el geólogo Pedro Gelabert, sobre la inspección ocular. Hizo seis recomendaciones, a saber: (1) definir las áreas específicas por desarrollar; (2) hacer una investigación por toda el área de la flora y la fauna; (3) aclarar y sustentar la diferencia entre un mogote y un montículo; (4) especificar la metodología utilizada para sustentar la extensión del terreno y sus puntos; (5) demostrar que no existe especies de flora que son considerados críticos, y (6) documentar la presencia de la Boa de Puerto Rico en los terrenos del proyecto.

([6]) Resulta importante señalar que el Departamento de Recursos Naturales y Ambientales no compareció a la vista pública ni sometió ningún comentario ante la Junta de Calidad Ambiental sobre la DIA-P y sus dos suplementos.

1996, la Oficina de Asesoramiento Científico de la Junta de Calidad Ambiental preparó un memorando, el cual contiene una serie de comentarios sobre la DIA-P y sus dos suplementos.

Así las cosas, el 15 de octubre de 1996 la Junta de Calidad Ambiental emitió una resolución en la que determinó que la DIA-P, con sus suplementos, cumplía con la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*) Asimismo, ordenó a la Junta de Planificación a preparar una declaración de impacto ambiental final (DIA-F) que incluyera los suplementos presentados ante la agencia, junto con los comentarios y las recomendaciones sometidas por las diversas agencias y el público en general. De igual forma, le requirió que respondiera a dichos comentarios y recomendaciones, y si algunos de éstos no ameritaban respuesta, se tenía que indicar la razón para sostener esa conclusión.[7]

De otra parte, el 13 de mayo de 1997 P.M.C.E. Comercial, S.E. y Decemor, S.E. sometieron ante la Junta de Calidad Ambiental una copia de un memorando de la División de Patrimonio Natural del Departamento de Recursos Naturales y Ambientales sobre el proyecto que aquí nos concierne, con el propósito de que se evaluara e incorporara al análisis de la DIA-P ante su consideración. Este memorando indicaba que la DIA-P del proyecto Comunidad Monte Rey no contenía la información básica necesaria, ya que había que realizar más estudios para evaluar adecua-

---

[7] P.M.C.E. Comercial, S.E. y Decemor, S.E., inconformes con la orden emitida por la Junta de Calidad Ambiental, solicitaron oportunamente una reconsideración. Ésta les fue denegada por medio de una resolución emitida el 12 de diciembre de 1996. Éstos procedieron, entonces, a presentar un recurso de revisión de decisión administrativa ante el Tribunal de Apelaciones (recurso Núm. KLRA9600443). El 11 de junio de 1998, el Tribunal de Apelaciones emitió una resolución en dicho caso, mediante la cual denegó la expedición del recurso por carecer de jurisdicción, ya que la decisión de la Junta de Calidad Ambiental era de carácter interlocutorio.

damente el impacto ambiental que podría causar la acción propuesta.(8)

El 16 de junio de 1997 la Junta de Calidad Ambiental denegó la solicitud de incorporar al expediente de la declaración de impacto ambiental preliminar el referido memorando, porque no era un documento oficial del Departamento de Recursos Naturales y Ambientales y, además, se presentó fuera del término establecido en su reglamento.

Inconformes con esa decisión, el 30 de octubre de 1997 P.M.C.E. Comercial, S.E. y Decemor, S.E. presentaron un recurso de revisión de la decisión administrativa (recurso Núm. KLRA97-00708), ante el entonces Tribunal de Circuito de Apelaciones. En éste alegaron que la Junta de Calidad Ambiental incidió al denegar la inclusión en el expediente administrativo del memorando preparado por la División de Patrimonio Natural del Departamento de Recursos Naturales y Ambientales.

Estando pendiente el referido recurso, la Junta de Planificación preparó y sometió ante la Junta de Calidad Ambiental la DIA-F solicitada, en la cual se incorporaron la DIA-P, los dos suplementos y los comentarios recibidos con sus respuestas. Posteriormente, el 1 de diciembre de 1998, la Junta de Calidad Ambiental emitió una resolución, en la que determinó que en la DIA-F se discutía adecuadamente los posibles efectos ambientales del proyecto propuesto e incluyó una carta con una serie de recomendaciones con el propósito de mejorar su realización. A esos efectos, el 24 de diciembre de 1998 se publicó el aviso ambiental en un diario de circulación general, donde se notificaba a la ciuda-

---

(8) En específico, el referido memorando planteaba lo siguiente: (1) hacer estudios más detallados sobre la flora y la fauna en los mogotes afectados por el proyecto porque no se descartaba la posible presencia de especies raras, vulnerables o en peligro de extinción; (2) hacer un estudio nocturno de la Boa de Puerto Rico; (3) hacer una búsqueda minuciosa de la herpetofauna; (4) considerar los mogotes como un corredor natural; (5) no se debe permitir la utilización del Bosque de Vega para intereses particulares.

danía sobre la disponibilidad de la DIA-F en la Junta de Calidad Ambiental.

Por otro lado, el 12 de mayo de 1999 el Tribunal de Circuito de Apelaciones emitió una sentencia en el caso Núm. KLRA97-00708, en la cual concluyó que el trámite administrativo ante la Junta de Calidad Ambiental, respecto a la DIA-P, había sido deficiente, debido a que no se había incorporado al expediente administrativo del proyecto ante la agencia el memorando preparado por la División de Patrimonio Natural del Departamento de Recursos Naturales y Ambientales. En vista de ello, el foro apelativo intermedio ordenó a la Junta de Calidad Ambiental que lo considerara e incorporara al expediente administrativo del proyecto.

En virtud de la sentencia emitida por el tribunal apelativo, el 24 de octubre de 2000 la Junta de Calidad Ambiental emitió una nueva resolución en la que consideró e incorporó el memorando del Departamento de Recursos Naturales y Ambientales. En dicha resolución, la Junta de Calidad Ambiental determinó que el memorando sólo se refería a la DIA-P y que éste no había tomado en consideración los otros documentos que se habían sometido, tales como la DIA-F, los dos suplementos y las respuestas a los comentarios sometidos sobre el proyecto. *La Junta de Calidad Ambiental procedió, entonces, a discutir cada uno de los señalamientos contenidos en el memorando del Departamento de Recursos Naturales y Ambientales, y determinó que éstos ya se habían considerado en la DIA-F y que no se justificaba alterar su determinación.* En vista de ello, la Junta de Calidad Ambiental *reiteró* su resolución del 1 de diciembre de 1998, determinando que la DIA-F discutía adecuadamente los posibles efectos ambientales del proyecto propuesto.

Inconformes con esa determinación, el 19 de enero de 2001 P.M.C.E. Comercial, S.E. y Decemor, S.E. presentaron un *nuevo* recurso de revisión de decisión administra-

tiva ante el Tribunal de Apelaciones (caso Núm. KLRA01-00044), en el que, en síntesis, alegaron que la Junta de Calidad Ambiental había incumplido con la sentencia previa del foro apelativo intermedio y con la función fiscalizadora que le impone la Ley sobre Política Pública Ambiental; esto último al no considerar adecuadamente el memorando del Departamento de Recursos Naturales y Ambientales antes de aprobar la DIA-P del proyecto, según estaba obligada a requerirle a la Junta de Planificación un estudio detallado sobre varios aspectos ambientales recomendados en dicho documento.

Así las cosas, Monte Rey, S.E. y M.R. Vega Alta, Inc. presentaron una *moción de desestimación* ante el foro apelativo intermedio en la que alegaron que el recurso de revisión presentado tenía un apéndice incompleto por carecer de una copia de la DIA-F. Ésta no fue acogida por el foro apelativo intermedio ante la posibilidad de que los planteamientos de los recurrentes no requirieran la evaluación de una DIA-F. No obstante esa determinación, el 29 de junio de 2001 el foro apelativo intermedio emitió una sentencia mediante la cual desestimó el recurso de revisión presentado por tener un apéndice incompleto, ya que entendía que la DIA-F era un documento esencial para resolver la controversia que giraba en torno a si la Junta de Calidad Ambiental había cumplido con su función fiscalizadora.

Inconforme con dicha determinación, el 1 de octubre de 2001 P.M.C.E. Comercial, S.E. y Decemor, S.E. presentaron recurso de *certiorari* ante este Tribunal en el que alegaron que el foro apelativo intermedio incidió al haber desestimado el recurso de revisión por tener un apéndice incompleto. Expedimos el recurso; el 15 de enero de 2003 emitimos una sentencia revocatoria (Caso Núm. CC-2001-770), en la que dejamos sin efecto la decisión del foro apelativo intermedio, en vista de que la DIA-F no era esencial para dilucidar el planteamiento de los peticionarios. Devol-

vimos el caso al foro apelativo intermedio para la continuación de los procedimientos.

Una vez devuelto el caso, el 27 de febrero de 2004 el Tribunal de Apelaciones emitió una sentencia en la que revocó la DIA-F aprobada por la Junta de Calidad Ambiental y ordenó que se cumpliera con lo estipulado en el memorando del Departamento de Recursos Naturales y Ambientales. *Fundamentó su determinación en que la Junta de Calidad Ambiental había incumplido con la sentencia anterior emitida por ese mismo foro, el 12 de mayo de 1999, al no considerar adecuadamente el referido memorando, ya que no le requirió a la Junta de Planificación llevar a cabo los estudios señalados en éste.* El foro apelativo intermedio determinó que la Junta de Calidad Ambiental justificó mediante su resolución la determinación de aprobar la DIA-F para tratar de cubrir su inacción con respecto a los serios cuestionamientos en torno a los problemas de la declaración de impacto ambiental.

Inconformes con la referida determinación, Monte Rey, S.E. y M.R. Vega Alta, Inc. recurrieron, oportunamente, ante este Tribunal mediante una petición de *certiorari* en la que alegaron, en síntesis y en lo pertinente, que erró el foro apelativo intermedio al resolver que la Junta de Calidad Ambiental se negó a cumplir con una sentencia anterior dictada por éste al no cumplir con lo estipulado en un memorando interno del Departamento de Recursos Naturales y Ambientales, y con la función fiscalizadora que le impone la Ley sobre Política Pública Ambiental.

*Expedimos* el recurso. Contando con la comparecencia de las partes, y estando en condición de resolver, procedemos a hacerlo.

I

La Constitución del Estado Libre Asociado de Puerto Rico dispone, en su Art. VI, Sec. 19, L.P.R.A., Tomo

1, ed. 1999. pág. 421, que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el mayor beneficio general de la comunidad ...".

La Asamblea Legislativa, en virtud del referido mandato constitucional, aprobó la Ley Núm. 9, *supra*,[9] conocida como Ley sobre Política Pública Ambiental, la cual procede sustancialmente de la *National Enviromental Policy Act of 1969* (NEPA), 43 U.S.C.A. sec. 4321 *et seq.*[10] Esta pieza legislativa se creó para, entre otras cosas, "atender de modo integral los asuntos concretos que se plantean en el país en relación con la administración del medio ambiente". (Citas omitidas.) *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908, 920 (1998).

Para cumplir con el propósito de implantar la política pública ambiental, la Ley Núm. 9, ante, creó la Junta de Calidad Ambiental. 12 L.P.R.A. sec. 1122(d). Entre las responsabilidades a su cargo, la Junta de Calidad Ambiental tiene la obligación de evaluar las acciones gubernamentales que impacten el medio ambiente, mediante un procedimiento de consultas u opiniones, en el cual participa activamente. 12 L.P.R.A. sec. 1124.

En vista de ello, el Art. 4(c) de la Ley Núm. 9, ante, exigía que los departamentos, las agencias, las corpo-

---

[9] Cabe *destacar* que la Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*) fue *derogada* por la Ley Núm. 416 de 22 de septiembre de 2004, conocida como Ley sobre Política Pública Ambiental de 2004 (12 L.P.R.A. sec. 8001 *et seq.*). *No obstante lo anterior*, para resolver la controversia ante nuestra consideración *aplicaremos las disposiciones de la derogada Ley Núm. 9*, ante, ya que la recién aprobada Ley Núm. 416, ante, dispone, en lo pertinente, que:

"Todo proceso *cuasi* judicial, administrativo, adjudicativo, etc. ya comenzado o pendiente antes de la vigencia de esta ley *se regirán por las leyes, reglamentos y órdenes aquí derogadas conforme a la ley aplicable al momento de ocurrir aquellos hechos o eventos que provocaron dichos procesos.*" (Énfasis suplido.) 12 L.P.R.A. sec. 8007f.

[10] La jurisprudencia interpretativa de la NEPA constituye una fuente persuasiva de gran peso al momento de interpretar la Ley Núm. 9, ante. *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908, 920 (1998).

raciones públicas, los municipios y las instrumentalidades del Estado Libre Asociado presentaran ante la Junta de Calidad Ambiental para su aprobación una declaración de impacto ambiental (DIA), escrita y detallada, "antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente ...". 12 L.P.R.A. sec. 1124(c). Véanse, también: *Misión Ind. P.R. v. J.C.A.*, ante, pág. 922; *García Oyola v. J.C.A.*, 142 D.P.R. 532, 540 (1997). Por lo tanto, la "fiscalización no sólo queda en manos de una entidad distinta a la que propone el proyecto en cuestión, sino [que] además ... queda en manos de una entidad especializada en asuntos ambientales, cuya función principal es precisamente velar por el fiel cumplimiento de la política pública ambiental de Puerto Rico". *Misión Ind. P.R. v. J.C.A.*, ante, pág. 928. Véase, también, *T-JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70 (1999).

El objetivo que persigue la preparación de la DIA es dual, a saber: (1) que la agencia proponente haya estudiado concienzudamente las consecuencias ambientales significativas del proyecto en cuestión, y (2) que las partes concernidas estén informadas de dichas consecuencias ambientales. No obstante, ello no obliga a la agencia proponente a discutir impactos insignificantes, improbables o especulativos, sino aquellos que un perito en la materia entienda que deban señalarse. *Misión Ind. P.R. v. J.C.A.*, ante, pág. 924. Por lo tanto, "la agencia proponente debe realizar un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sean previsibles". (Énfasis suprimido.) Íd.

Al evaluar la adecuacidad de una DIA, la Junta de Calidad Ambiental no tiene que llevar a cabo

... un análisis matemático preciso o perfecto que garantice que el proyecto propuesto no ha de tener impacto ambiental adverso alguno. Lo que se persigue es que la declaración de impacto ambiental provea información suficiente que ponga en

perspectiva las consecuencias, tanto favorables como desfavorables, de la acción gubernamental propuesta. (Citas omitidas.) *Misión Ind. P.R. v. J.C.A.*, ante, pág. 938.

*En fin, antes de plasmar su aprobación, la Junta de Calidad Ambiental, como custodio del medio ambiente, tiene la responsabilidad de velar por que la DIA presentada ante su consideración cumpla cabalmente con todos los requisitos —tanto sustantivos como procesales— impuestos por el Art. 4(c) de la Ley Núm. 9, ante, y sus reglamentos. Misión Ind. P.R. v. J.C.A., ante, pág. 922. Cabe aclarar que la función de la Junta de Calidad Ambiental no es autorizar o desautorizar el proyecto que ha de desarrollarse, sino determinar si la declaración de impacto ambiental es apta para la acción que se quiere realizar. Véase Misión Ind. P.R. v. J.C.A., ante, pág. 948.*

La preparación y aprobación de una DIA es una etapa preliminar en la que se garantiza "que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el medio ambiente". *Misión Ind. P.R. v. J.C.A.*, ante, pág. 925. En fin, la DIA es un mecanismo de planificación, o sea, el primer escalón en el largo proceso de la obtención de permisos y autorizaciones oficiales del proyecto propuesto. Íd.

No obstante, su aprobación no conlleva que no se tomen otras medidas ulteriores para la protección del ambiente. Incluso, posterior a la aprobación de la DIA o luego de comenzado el proyecto, si éste no se lleva conforme a la DIA, si las consecuencias ambientales son mayores que las previstas o si surgen efectos adversos no anticipados, la Junta de Calidad Ambiental puede y debe tomar las medidas necesarias para evitar cualquier daño adicional al ambiente. *Misión Ind. P.R. v. J.C.A.*, ante, pág. 925.

En resumen, pues, una declaración de impacto ambiental es el instrumento que provee nuestro ordenamiento jurídico para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y de tomar las primeras decisiones gubernamentales.

## II

Por otro lado, la propia Ley Núm. 9, ante, expresamente disponía el alcance de la intervención judicial en casos como el de autos: ordenaba que la revisión judicial se habría de llevar a cabo a base del expediente administrativo de los procedimientos ante la Junta de Calidad Ambiental, cuyas determinaciones de hechos serían concluyentes si estaban sostenidas por evidencia sustancial. 12 L.P.R.A. sec. 1134(g). En virtud de ello, hemos expresado que se trata, pues, del mismo alcance que tiene la revisión judicial respecto a las decisiones de cualquier otra agencia administrativa. *Misión Ind. P.R. v. J.C.A.*, ante, pág. 929. Véase, también, 3 L.P.R.A. sec. 2175.

A tono con lo anterior, para poder analizar las cuestiones planteadas desde su justa perspectiva, *debemos esbozar varios principios que constituyen el marco conceptual de la revisión judicial de las decisiones administrativas.*

El propósito primordial de dicha revisión consiste en demarcar el ámbito de discreción de las agencias administrativas y cerciorarse que éstas ejecuten sus funciones de acuerdo con la ley. *L.P.C. & D., Inc. v. A.C.*, 149 D.P.R. 869 (1999); *Mun. de San Juan v. J.C.A.*, 149 D.P.R. 263, 279 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998).

Como es sabido, en el crisol judicial, las decisiones o resoluciones, al igual que las interpretaciones de las agencias administrativas, merecen gran consideración y respeto. *Otero v. Toyota*, 163 D.P.R. 716 (2005); *Rebollo v.*

*Yiyi Motors*, 161 D.P.R. 69 (2004); *Rivera Concepción v. A.R.Pᴇ.*, 152 D.P.R. 116 (2000); *Castillo v. Depto. del Trabajo*, 152 D.P.R. 91 (2000); *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70 (2000). Esta deferencia judicial a las decisiones administrativas se debe a que las agencias cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados. Íd.

En virtud de esta deferencia, los tribunales no deben alterar las determinaciones de hecho suscritas por las agencias administrativas "si se basan en evidencia sustancial que obra en el expediente administrativo" considerado en su totalidad. Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175.[11] Hemos reiterado en numerosas ocasiones que la evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, ante, pág. 75. Véanse: *Misión Ind. P.R. v. J.P.*, ante, pág. 131; *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 687 (1953).

El propósito primordial de la doctrina de la evidencia sustancial es *"evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor"*. (Énfasis suplido.) *P.R.T.C. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269, 282 (2000); *Misión Ind. P.R. v. J.P.*, ante; *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85, 95 (1997). De igual forma, *no les corresponde a los tribunales pasar juicio sobre los conflictos de prueba entre opiniones especializadas o científicas*. Véase *Misión Ind. P.R. v. J.C.A.*, ante.

---

[11] Véanse, también: *Rivera Concepción v. A.R.Pᴇ.*, 152 D.P.R. 116 (2000); *P.R.T.C. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269 (2000); *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70, 75 (2000); *Costa, Piovanetti v. Caguas Expressway*, 149 D.P.R. 881, 889 (1999).

■ Correlativo con ello, hemos señalado que los procedimientos y las decisiones de las agencias administrativas *están cobijadas* por una presunción de regularidad y corrección. *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999); *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 D.P.R. 750 (1999); *Misión Ind. P.R. v. J.P.*, ante; *Maisonet v. F.S.E.*, 142 D.P.R. 194 (1996). Por lo tanto, aquel que aduzca lo contrario *tiene que presentar prueba suficiente* que derrote dicha presunción. *Ramírez v. Depto. de Salud*, ante; *Com. Vec. Pro-Mej., Inc. v. J.P.*, ante; *Misión Ind. P.R. v. J.P.*, ante.

■ De esta manera, la parte que impugne las determinaciones de hechos de la agencia tiene que convencer al foro judicial de que la evidencia en la cual ésta se apoyó para formular tales determinaciones no es sustancial. A esos efectos, hemos expresado que la parte

[d]ebe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, *hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.*[12]

■ Por otra parte, las conclusiones de derecho emitidas por las agencias administrativas son revisables en su totalidad. Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, ante. Ello no implica, sin embargo, que los tribunales, *sin razón alguna*, puedan rechazar las conclusiones de derecho de las agencias administrativas e impongan su criterio. *Otero v. Toyota*, ante. De ordinario, los tribunales conceden *gran peso y deferencia* a las interpretaciones que dichos organismos realizan de las leyes que les corresponde administrar. Como indicáramos, las agencias administrativas, contrario a los tribunales, "cuentan con experiencias y conocimientos altamente especializados sobre los asuntos

---

[12] *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 131 (1998).

que se le encomiendan". *Rivera Concepción v. A.R.Pe.*, ante, pág. 123.([13]) Además, "las agencias administrativas son instrumentos necesarios para la interpretación de la ley". *P.R.T.C. v. J. Reg. Tel. de P.R.*, ante, pág. 283. Véase, además, *Misión Ind. P.R. v. J.P.*, ante, pág. 130.

Así también, es meritorio precisar que la interpretación de una ley por la agencia encargada de velar por su cumplimiento *no* tiene que ser la única razonable. *Sin embargo, incluso en casos dudosos, la interpretación de la agencia merece la referida deferencia.* Véanse: *P.R.T.C. v. J. Reg. Tel. de P.R.*, ante, pág. 283; *Misión Ind. P.R. v. J.P.*, ante, pág. 133.

No obstante lo anterior, los tribunales se abstendrán de avalar una decisión administrativa si la agencia: (1) erró al aplicar la ley;([14]) (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales.([15])

En resumen, el *criterio que debemos aplicar no es si la decisión administrativa es la más razonable o la mejor; es, repetimos, si la determinación de la agencia, en interpretación de los reglamentos y las leyes que le incumbe implementar, es razonable.* Véase *Rivera Concepción v. A.R.Pe.*, ante, pág. 124. Por lo tanto, carente de irrazonabilidad o ilegalidad, no nos compete imponer nuestro criterio motivado por razones foráneas *ni pasar juicio sobre la sabiduría de una determinación de política pública ambiental que le corresponde a otra rama gubernamental.* Véanse: *Misión Ind. P.R. v. J.P.*, ante, pág. 129 esc. 39; *Misión Ind. P.R. v. J.C.A.*, ante, págs. 940 y 945.

En virtud de lo anterior, y en lo que respecta a la controversia ante nuestra consideración, son muy ilustrativas

---

([13]) Véanse: *Castillo v. Depto. del Trabajo*, 152 D.P.R. 91, 96 (2000); *Misión Ind. P.R. v. J.P.*, ante.

([14]) *Castillo v. Depto. del Trabajo*, ante.

([15]) *Rivera Concepción v. A.R.Pe.*, ante.

las expresiones del Tribunal Supremo de Estados Unidos en el caso *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978), en donde se analizó la revisión judicial bajo la NEPA, ley modelo en la que se basa nuestra Ley sobre Política Pública Ambiental. El Tribunal Supremo de Estados Unidos expresó:

> NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. It is to insure a fully informed and well-considered decision, *not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.* Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, *not simply because the court is unhappy with the result reached.* (Citas omitidas y énfasis suplido.) *Vermont Yankee Nuclear Power Corp. v. NRDC*, ante, pág. 558.

## III

En la controversia presentada ante nos debemos determinar si la Junta de Calidad Ambiental, al aprobar la DIA-F, incumplió con la sentencia emitida por el Tribunal de Apelaciones el 12 de mayo de 1999 (caso Núm. KLRA97-00708). En esta sentencia el foro apelativo intermedio le había ordenado a dicha agencia que *considerara e incorporara* al expediente administrativo del proyecto Comunidad Monte Rey, el memorando del 20 de diciembre de 1996 de la División de Patrimonio Natural del Departamento de Recursos Naturales y Ambientales.

Los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. sostienen, *como único fundamento para impugnar la determinación de la agencia,* que la Junta de Calidad Ambiental actuó irrazonablemente e incumplió con la sentencia del foro apelativo intermedio, ya que para verdaderamente incorporar y considerar el memorando estaba obligada a ordenarle a la Junta de Planificación hacer los estudios que se plantearon en el documento del Departamento de Re-

cursos Naturales y Ambientales antes de aprobar la DIA-F. *No le asiste la razón.*

De entrada, debemos señalar que en ninguna parte de la sentencia dictada por el Tribunal de Apelaciones se le ordenó a la Junta de Calidad Ambiental realizar los estudios recomendados en el memorando del Departamento de Recursos Naturales y Ambientales.[16] El foro apelativo intermedio lo que le ordenó a la agencia fue, *repetimos*, incorporar y considerar el referido memorando. *Procede, entonces, evaluar si a la luz de la totalidad del expediente administrativo, la actuación de la Junta de Calidad Ambiental, al reafirmarse en su aprobación de la DIA-F sin llevar cabo los estudios que se recomendaban en el memorando, fue irrazonable.* Veamos.

La Junta de Calidad Ambiental emitió una nueva resolución, el 24 de octubre de 2000, en la cual reafirmó su aprobación de la DIA-F y consideró e incorporó el memorando del Departamento de Recursos Naturales y Ambientales. En dicha resolución, la Junta de Calidad Ambiental determinó que el memorando sólo se refería a la DIA-P y que no se había tomado en consideración los otros documentos presentados posteriormente y que formaban parte del expediente administrativo, tales como la DIA-F, los dos suplementos y las respuestas a los comentarios que se habían sometido sobre el proyecto.[17]

No obstante lo anterior, la Junta de Calidad Ambiental

---

[16] En la disposición del caso el foro apelativo intermedio expresó lo siguiente:

"Por los fundamentos anteriormente expuestos, se revoca la resolución emitida el 16 de junio de 1997 por la Junta de Calidad Ambiental. Asimismo, *se ordena incorporar el informe preparado el 20 de diciembre de 1996 por la División de Patrimonio Natural del Departamento de Recursos Naturales al expediente administrativo que dicha agencia lleva sobre la consulta de ubicación número 92-10-1418-JPU.*"

[17] Un examen minucioso del referido memorando nos convence que la Junta de Calidad Ambiental tenía razón al indicar que éste se refería sólo a la DIA-P y que no había tomado en cuenta los otros documentos que se habían presentado ante la agencia que posiblemente podían contestar muchas de las interrogantes del Departamento de Recursos Naturales y Ambientales. De una lectura del memorando podemos ver que los señalamientos contenidos se refieren a la DIA-P y en ningún momento se hace referencia ni se mencionan los documentos que se presentaron posteriormente ante la Junta de Calidad Ambiental.

procedió, entonces, en su resolución *a discutir cada uno de los señalamientos contenidos en el memorando del Departamento de Recursos Naturales y Ambientales, y determinó que éstos ya se habían considerado en la DIA-F y que no se justificaba alterar su determinación ni realizar nuevos estudios.*

El referido memorando tenía varios señalamientos específicos sobre la DIA-P, a saber: (1) debían hacerse estudios más detallados sobre la flora y la fauna en todos los mogotes porque no se descartaba la posible presencia de especies raras, vulnerables o en peligro de extinción; (2) incluir un estudio nocturno de la Boa de Puerto Rico; (3) hacer una búsqueda minuciosa de la herpetofauna; (4) se faltó considerar los mogotes como un corredor natural, y (5) no se debe permitir la utilización del Bosque de Vega para el beneficio de intereses particulares. *Veamos cómo la Junta de Calidad Ambiental consideró en la resolución emitida cada uno de los señalamientos del memorando.*

1. *Estudios de flora y fauna de todos los mogotes*: La Junta de Calidad Ambiental expresó en su resolución que ya la Junta de Planificación había atendido ese señalamiento en los dos suplementos y en la DIA-F presentada en virtud de que se había establecido que el 97% de *todos* los mogotes iban a ser conservados y no se iban a afectar por el proyecto, y el 100% de los mogotes de gran altura no se iban a tocar. Como consecuencia, la Junta de Calidad Ambiental entendió que no era necesario estudiar todos los mogotes, sino sólo los que se iban afectar por el proyecto.

Por lo tanto, la Junta de Calidad Ambiental aceptó como adecuados los estudios realizados por la Junta de Planificación, como agencia proponente, de los mogotes que serían afectados. Conforme a ello, señaló que en la DIA-F se escogieron tres mogotes representativos de las condiciones relevantes, a saber: (1) altos, aislados y bien conservados; (2) altos, continuos y bien conservados; (3) bajos, aislados y perturbados. Sin embargo, los estudios realizados no se

quedaron ahí, sino que conforme a la DIA-F se inspeccionaron los otros mogotes que serían afectados por el proyecto.

Asimismo, de la DIA-F surge que el estudio de la flora y la fauna incluyó la totalidad de los terrenos que iban a ser utilizados para el proyecto. En la DIA-F se señaló todas las especies que se encontraron en dicho estudio sobre la flora y la fauna, se expresó, además, la manera en que iban a ser impactados y se ofrecieron alternativas para su protección.

Conforme a lo anterior, la Junta de Calidad Ambiental entendió que el estudio de la flora y la fauna, incluso el de los mogotes, era adecuado y que no era necesario hacer los estudios que señalaba el memorando del Departamento de Recursos Naturales y Ambientales, ya que se habían hecho. Somos del criterio que dicha determinación es razonable; sería ilógico tener que exigir un estudio de todos los mogotes cuando la mayoría de ellos no van a ser afectados por el proyecto.

2. *Estudio nocturno de la Boa de Puerto Rico*: La Junta de Calidad Ambiental expresó en su resolución que ya se habían realizado los estudios de los ecosistemas que incluyeron la totalidad de los terrenos. Se determinó que la Boa de Puerto Rico se encuentra en las áreas que van a ser conservadas, por lo que no se verá afectada por el proyecto.[18]

3. *Búsqueda minuciosa de la herpetofauna*: La Junta de Calidad Ambiental expresó en su resolución que en la DIA-F se discutió adecuadamente este planteamiento, ya que sólo se encontraron cuatro anfibios y que no se encontró ninguna culebra en los estudios que se hicieron en los terrenos afectados por el proyecto. Aunque en el memorando se expresaba que posiblemente podía haber otras especies de anfibios, la Junta de Calidad Ambiental señaló

---

[18] Para ello, en la resolución se cita extensamente las porciones de la DIA-F y del Segundo Suplemento en que se discute este señalamiento.

que la Junta de Planificación discutió adecuadamente ese punto porque demostró que en los terrenos del proyecto, debido a su alta percolación y a que no existen cuerpos de agua superficiales, el número de anfibios es más reducido que en otras zonas. De esta forma, la Junta de Calidad Ambiental entendió que, como ya se había realizado el estudio sobre la herpetofauna, resultaba innecesario volver a hacerlo.

4. *Considerar los mogotes como un corredor natural*: En el memorando del Departamento de Recursos Naturales y Ambientales se hace este señalamiento por la preocupación de que los mogotes aislados actuaban como un corredor natural para la fauna del área y su destrucción podía ocasionar una fragmentación de las poblaciones de animales. La Junta de Calidad Ambiental señaló, en la resolución que emitiera, que esta preocupación había sido atendida, ya que se proveyeron las medidas para proteger la fauna en los mogotes aislados. Entre estas medidas, se señaló que se iba a proveer unas avenidas de árboles para las aves y otra clase de fauna que se encuentran en dichos mogotes.

5. *La utilización del Bosque de Vega para el beneficio de intereses particulares*: En cuanto a este punto, la Junta de Calidad Ambiental señaló que esta preocupación también se había discutido en la DIA-F. A esos efectos, señaló que el Bosque de Vega no se iba a utilizar para el beneficio de intereses particulares. Expresó, además, que lo único que se pretendía hacer era una calle, la cual había sido propuesta por el Municipio de Vega Alta y, por ende, implicaba que ello conllevaba un interés público. Por último, señaló que la calle se iba a realizar en unos terrenos llanos, con escasa vegetación, por lo que su impacto ecológico sería reducido.

Por otro lado, la Junta destacó que la acción propuesta contemplaba la cesión de once punto siete cuerdas de te-

rrenos con mogotes para ser integrados al Bosque de Vega, por lo que el proyecto resultaría en la ampliación del bosque. Señaló, además, que también el proyecto contemplaba la cesión de otras sesenta cuerdas de terrenos con mogotes localizados en las cercanías del bosque.

## IV

En virtud de lo expuesto, y luego de examinar minuciosamente el expediente administrativo, *concluimos que la determinación de la Junta de Calidad Ambiental está sustentada por evidencia sustancial. Determinamos, además, que la actuación de la Junta de Calidad Ambiental, al considerar cada uno de los señalamientos del memorando del Departamento de Recursos Naturales y Ambientales, fue razonable y cónsona con la sentencia emitida por el Tribunal de Apelaciones.* La conclusión de la Junta de Calidad Ambiental, en cuanto a que los estudios señalados en el memorando no eran necesarios porque ya se habían realizado, es razonable. Resolvemos, en consecuencia, *que la agencia no incurrió en abuso de discreción al actuar así.*

Como indicáramos, los procedimientos y las decisiones de las agencias administrativas *están cobijadas* por una presunción de regularidad y corrección. *Otero v. Toyota*, ante. Los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. *no* han derrotado dicha presunción mediante evidencia. Su único fundamento para impugnar la decisión de la Junta de Calidad Ambiental —de que ésta estaba obligada por la sentencia emitida por el Tribunal de Apelaciones a requerir de la Junta de Planificación que procediera a realizar los estudios que se señalaron en el memorando del Departamento de Recursos Naturales y Ambientales— *no es correcto.* Los recurridos *no* han demostrado que de la totalidad del expediente administrativo surja otra prueba que nos lleve a concluir que la determinación de la Junta de Calidad Ambiental fue irrazonable.

Según mencionáramos, *la función de la Junta de Calidad Ambiental no es autorizar o desautorizar un proyecto que ha de desarrollarse, sino determinar si la declaración de impacto ambiental es apta para la acción que se quiere realizar.* Al tomar en consideración lo anterior, somos del criterio que existe *evidencia suficiente* en el expediente administrativo para determinar que la agencia *no* actuó irrazonablemente al determinar que la declaración de impacto ambiental final era adecuada.

## V

Por los fundamentos antes expuestos, *se revoca la sentencia emitida por el Tribunal de Apelaciones y se devuelve el caso a la agencia recurrida para ulteriores procedimientos compatibles con lo aquí resuelto.*

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Hernández Denton se inhibió. La Jueza Asociada Señora Fiol Matta disintió sin opinión escrita. La Juez Asociada Señora Rodríguez Rodríguez no interviene.